# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| **HILLCREST BANK, N.A.,** | ) | |
| | ) | |
| **Substituted Plaintiff** | ) | **Case No. 10-CV-00967-DGK** |
| | ) | |
| **DONNA RICE,** | ) | |
| | ) | |
| **JEFFREY F. WHEELER,** | ) | |
| | ) | |
| **JON FORGEY,** | ) | |
| | ) | |
| **THOMAS S. DREYER,** | ) | |
| | ) | |
| **JACK N. FINGERSH,** | ) | |
| | ) | |
| **PAUL FINGERSH,** | ) | |
| | ) | |
| **GEORGE LIEBERMAN,** | ) | |
| | ) | |
| **JERRY M. WHITE,** | ) | |
| | ) | |
| **SCOTT ASNER,** | ) | |
| | ) | |
| **Counterclaim-Defendants** | ) | |
| **v.** | ) | |
| | ) | |
| **JACK H. CORDSEN,** | ) | |
| | ) | |
| **JACK H. CORDSEN TRUST UTA,** | ) | |
| | ) | |
| **HIDDEN RIDGE BUILDING CORPORATION,** | ) | |
| | ) | |
| **WINTERBERRY DEVELOPMENT, LLC,** | ) | |
| | ) | |
| **Defendants/Counterclaim Plaintiffs** | ) | |
| | ) | |

## DEFENDANTS' FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO HILLCREST BANK'S COMPLAINT

For their first amended answer and affirmative defenses to plaintiff Hillcrest Bank N.A.'s ("**Hillcrest**") claims in the Complaint (the "**Complaint**"), defendants Jack H. Cordsen ("**Cordsen**"), Jack H. Cordsen Trust UTA (the "**Trust**"), Hidden Ridge Building Corporation ("**Hidden Ridge**"), and Winterberry Development, LLC ("**Winterberry**," and with Cordsen, the Trust, and Hidden Ridge, sometimes collectively, the "**Defendants**"), by their counsel, states and alleges as follows:

Unless specifically admitted in this Answer, all claims, theories, allegations and paragraphs in the Complaint are denied.

## PARTIES AND VENUE

1.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint, and, therefore, deny the same.

2.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 2 of the Complaint, and, therefore, deny the same.

3.     As to the allegations in paragraph 3 of the Complaint, Cordsen admits that he is an individual, but denies that he lives at the listed address.

4.     As to the allegations in paragraph 4 of the Complaint, the Trust admits that it is a trust and that the sole trustee is Cordsen.  Further answering, the Trust denies that it may be served at the listed address.

5.     Admitted.

6.     Admitted.

7.     Paragraph 7 of the Complaint calls for a legal conclusion to which no answer is required, and, therefore, Defendants deny same.

8.     Paragraph 8 of the Complaint calls for a legal conclusion to which no answer is required, and, therefore, Defendants deny same.

9.     Paragraph 9 of the Complaint calls for a legal conclusion to which no answer is required, and, therefore, Defendants deny same.

## THE HIDDEN RIDGE LOT LOAN

10.     As to the allegations in paragraph 10 of the Complaint, Hidden Ridge states that the Hidden Ridge Lot Loan Agreement is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

11.     As to the allegations in paragraph 11 of the Complaint, Hidden Ridge states that the Hidden Ridge Lot Loan Agreement, attached as Exhibit A to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Lot Loan Agreement is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether the agreement is a complete and accurate copy of the original, and, therefore, denies the same.

12.     As to the allegations in paragraph 12 of the Complaint, Hidden Ridge states that the Hidden Ridge Lot Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

13.     As to the allegations in paragraph 13 of the Complaint, Hidden Ridge states that the Hidden Ridge Lot Note, attached as Exhibit B to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Lot Note is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information

sufficient to form a belief as to whether the promissory note is a complete and accurate copy of the original, and, therefore, denies the same.

14.     As to the allegations in paragraph 14 of the Complaint, Cordsen states that the Cordsen First Hidden Ridge Guaranty is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document.

15.     As to the allegations in paragraph 15 of the Complaint, Cordsen states that the Cordsen First Hidden Ridge Guaranty, attached as Exhibit C to the Complaint, is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen First Hidden Ridge Guaranty is a document produced by Hillcrest Bank. Cordsen lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

16.     Hidden Ridge lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint, and, therefore, denies the same.

17.     As to the allegations in paragraph 17 of the Complaint, Hidden Ridge states that the Fourteenth Hidden Ridge Lot Loan Modification is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

18.     As to the allegations in paragraph 18 of the Complaint, Hidden Ridge states that the Fourteenth Hidden Ridge Lot Loan Modification, attached as Exhibit D to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Fourteenth Hidden Ridge Lot Loan Modification is a document produced by Hillcrest Bank. Hidden Ridge lacks

knowledge and information sufficient to form a belief as to whether this agreement is a complete and accurate copy of the original, and, therefore, denies the same.

19.     As to the allegations in paragraph 19 of the Complaint, Hidden Ridge states that the Hidden Ridge Lot Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

## THE HIDDEN RIDGE CONSTRUCTION LOAN

20.     As to the allegations in paragraph 20 of the Complaint, Hidden Ridge states that the Hidden Ridge Construction Loan Agreement is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

21.     As to the allegations in paragraph 21 of the Complaint, Hidden Ridge states that the Hidden Ridge Construction Loan Agreement, attached as Exhibit E to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Construction Loan Agreement is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether the agreement is a complete and accurate copy of the original, and, therefore, denies the same.

22.     As to the allegations in paragraph 22 of the Complaint, Hidden Ridge states that the Hidden Ridge Construction Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

23.     As to the allegations in paragraph 23 of the Complaint, Hidden Ridge states that the Hidden Ridge Construction Note, attached as Exhibit F to the Complaint, is a written

document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Construction Note is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether the promissory note is a complete and accurate copy of the original, and, therefore, denies the same.

24. As to the allegations in paragraph 24 of the Complaint, Cordsen states that the Cordsen Second Hidden Ridge Guaranty is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document.

25. As to the allegations in paragraph 25 of the Complaint, Cordsen states that the Cordsen Second Hidden Ridge Guaranty, attached as Exhibit G to the Complaint, is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Second Hidden Ridge Guaranty is a document produced by Hillcrest Bank. Cordsen lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

26. Hidden Ridge lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint, and, therefore, denies the same.

27. As to the allegations in paragraph 27 of the Complaint, Hidden Ridge states that the Sixteenth Hidden Ridge Construction Loan Modification is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

28. As to the allegations in paragraph 28 of the Complaint, Hidden Ridge states that the Sixteenth Hidden Ridge Construction Loan Modification, attached as Exhibit H to the

Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Sixteenth Hidden Ridge Construction Loan Modification is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether this agreement is a complete and accurate copy of the original, and, therefore, denies the same.

29. As to the allegations in paragraph 29 of the Complaint, Hidden Ridge states that the Hidden Ridge Construction Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

## THE HIDDEN RIDGE BRIDGE I LOAN

30. As to the allegations in paragraph 30 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge I Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

31. As to the allegations in paragraph 31 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge I Note, attached as Exhibit I to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Bridge I Note is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether the promissory note is a complete and accurate copy of the original, and, therefore, denies the same.

32. As to the allegations in paragraph 32 of the Complaint, Cordsen states that the Cordsen Third Hidden Ridge Guaranty is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document.

33.     As to the allegations in paragraph 33 of the Complaint, Cordsen states that the Cordsen Third Hidden Ridge Guaranty, attached as Exhibit J to the Complaint, is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Third Hidden Ridge Guaranty is a document produced by Hillcrest Bank. Cordsen lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

34.     As to the allegations in paragraph 34 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge I Loan Modification is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

35.     As to the allegations in paragraph 35 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge I Loan Modification, attached as Exhibit K to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Bridge I Loan Modification is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether this agreement is a complete and accurate copy of the original, and, therefore, denies the same.

36.     As to the allegations in paragraph 36 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge I Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

# THE HIDDEN RIDGE BRIDGE II LOAN

37.     As to the allegations in paragraph 37 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge II Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

38.     As to the allegations in paragraph 38 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge II Note, attached as Exhibit L to the Complaint, is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Hidden Ridge Bridge II Note is a document produced by Hillcrest Bank. Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether the promissory note is a complete and accurate copy of the original, and, therefore, denies the same.

39.     As to the allegations in paragraph 39 of the Complaint, Cordsen states that the Cordsen Fourth Hidden Ridge Guaranty is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document.

40.     As to the allegations in paragraph 40 of the Complaint, Cordsen states that the Cordsen Fourth Hidden Ridge Guaranty, attached as Exhibit M to the Complaint, is a written document and, therefore, speaks for itself. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Fourth Hidden Ridge Guaranty is a document produced by Hillcrest Bank. Cordsen lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

41.     As to the allegations in paragraph 41 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge II Note is a written document and, therefore, speaks for itself.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

## THE CORDSEN TRUST HIDDEN RIDGE GUARANTIES

42.     As to the allegations in paragraph 42 of the Complaint, the Trust states that the Cordsen Trust First Guaranty is a written document and, therefore, speaks for itself.  The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.

43.     As to the allegations in paragraph 43 of the Complaint, the Trust states that the Cordsen Trust First Guaranty, attached as Exhibit N to the Complaint, is a written document and, therefore, speaks for itself.  The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.  Further answering, the Cordsen Trust First Guaranty is a document produced by Hillcrest Bank.  The Trust lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

44.     As to the allegations in paragraph 44 of the Complaint, the Trust states that the Cordsen Trust Second Guaranty is a written document and, therefore, speaks for itself.  The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.

45.     As to the allegations in paragraph 45 of the Complaint, the Trust states that the Cordsen Trust Second Guaranty, attached as Exhibit O to the Complaint, is a written document and, therefore, speaks for itself.  The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.  Further answering, the Cordsen Trust Second Guaranty is a document produced by Hillcrest Bank.  The Trust lacks knowledge and information

sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

46.     As to the allegations in paragraph 46 of the Complaint, the Trust states that the Cordsen Trust Third Guaranty is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.

47.     As to the allegations in paragraph 47 of the Complaint, the Trust states that the Cordsen Trust Third Guaranty, attached as Exhibit P to the Complaint, is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Trust Third Guaranty is a document produced by Hillcrest Bank. The Trust lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

## THE WINTERBERRY DEVELOPMENT, LLC LOAN

48.     As to the allegations in paragraph 48 of the Complaint, Winterberry states that the Winterberry Loan Agreement is a written document and, therefore, speaks for itself. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document.

49.     As to the allegations in paragraph 49 of the Complaint, Winterberry states that the Winterberry Loan Agreement, attached as Exhibit Q to the Complaint, is a written document and, therefore, speaks for itself. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Winterberry Loan Agreement is a document produced by Hillcrest Bank. Winterberry lacks knowledge and information sufficient

to form a belief as to whether the agreement is a complete and accurate copy of the original, and, therefore, denies the same.

50.     As to the allegations in paragraph 50 of the Complaint, Winterberry states that the Winterberry Note is a written document and, therefore, speaks for itself.   Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document.

51.     As to the allegations in paragraph 51 of the Complaint, Winterberry states that the Winterberry Note, attached as Exhibit R to the Complaint, is a written document and, therefore, speaks for itself.   Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document.   Further answering, the Winterberry Note is a document produced by Hillcrest Bank.   Winterberry lacks knowledge and information sufficient to form a belief as to whether the promissory note is a complete and accurate copy of the original, and, therefore, denies the same.

52.     As to the allegations in paragraph 52 of the Complaint, Cordsen states that the Cordsen Winterberry Guaranty is a written document and, therefore, speaks for itself.   Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document.

53.     As to the allegations in paragraph 53 of the Complaint, Cordsen states that the Cordsen Winterberry Guaranty, attached as Exhibit S to the Complaint, is a written document and, therefore, speaks for itself.   Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast that document.   Further answering, the Cordsen Winterberry Guaranty is a document produced by Hillcrest Bank.   Cordsen lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

54.     As to the allegations in paragraph 54 of the Complaint, the Trust states that the Cordsen Trust First Winterberry Guaranty is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.

55.     As to the allegations in paragraph 55 of the Complaint, the Trust states that the Cordsen Trust First Winterberry Guaranty, attached as Exhibit T to the Complaint, is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Trust First Winterberry Guaranty is a document produced by Hillcrest Bank. The Trust lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

56.     As to the allegations in paragraph 56 of the Complaint, the Trust states that the Cordsen Trust Second Winterberry Guaranty is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.

57.     As to the allegations in paragraph 57 of the Complaint, the Trust states that the Cordsen Trust Second Winterberry Guaranty, attached as Exhibit U to the Complaint, is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Trust Second Winterberry Guaranty is a document produced by Hillcrest Bank. The Trust lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

58.     As to the allegations in paragraph 58 of the Complaint, the Trust states that the Cordsen Trust Third Winterberry Guaranty is a written document and, therefore, speaks for

itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document.

59. As to the allegations in paragraph 59 of the Complaint, the Trust states that the Cordsen Trust Third Winterberry Guaranty, attached as Exhibit V to the Complaint, is a written document and, therefore, speaks for itself. The Trust specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Cordsen Trust Third Winterberry Guaranty is a document produced by Hillcrest Bank. The Trust lacks knowledge and information sufficient to form a belief as to whether the guaranty is a complete and accurate copy of the original, and, therefore, denies the same.

60. Winterberry lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the Complaint, and, therefore, denies the same.

61. As to the allegations in paragraph 61 of the Complaint, Winterberry states that the Eighth Winterberry Loan Modification is a written document and, therefore, speaks for itself. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document.

62. As to the allegations in paragraph 62 of the Complaint, Winterberry states that the Eighth Winterberry Loan Modification, attached as Exhibit W to the Complaint, is a written document and, therefore, speaks for itself. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document. Further answering, the Eighth Winterberry Loan Modification is a document produced by Hillcrest Bank. Winterberry lacks knowledge and information sufficient to form a belief as to whether this agreement is a complete and accurate copy of the original, and, therefore, denies the same.

63.     As to the allegations in paragraph 63 of the Complaint, Winterberry states that the Winterberry Note is a written document and, therefore, speaks for itself. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast that document.

## FAILURES TO MAKE PAYMENTS

64.     As to the allegations in paragraph 64 of the Complaint, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Lot Note, the Hidden Ridge Lot Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

65.     As to the allegations in paragraph 65 of the Complaint, Hidden Ridge states that the Hidden Ridge Lot Loan Agreement and Hidden Ridge Lot Note are written documents and, therefore, speak for themselves. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast these documents. Further answering, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Lot Note, the Hidden Ridge Lot Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

66.     As to the allegations in paragraph 66 of the Complaint, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Construction Note, the Hidden Ridge Construction Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

67.     As to the allegations in paragraph 67 of the Complaint, Hidden Ridge states that the Hidden Ridge Construction Loan Agreement and Hidden Ridge Construction Note are written documents and, therefore, speak for themselves. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast these documents. Further answering, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Construction Note, the Hidden Ridge Construction Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

68.     As to the allegations in paragraph 68 of the Complaint, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Bridge I Note, the Hidden Ridge Bridge I Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

69.     As to the allegations in paragraph 69 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge I Note is a written document and, therefore, speaks for itself. Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast this document. Further answering, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Bridge I Note, the Hidden Ridge Bridge I Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

70.     As to the allegations in paragraph 70 of the Complaint, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Bridge II Note, the Hidden Ridge Bridge II Note had not matured, was not due, or Hidden

Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

71.     As to the allegations in paragraph 71 of the Complaint, Hidden Ridge states that the Hidden Ridge Bridge II Note is a written document and, therefore, speaks for itself.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast this document.  Further answering, Hidden Ridge states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Hidden Ridge Bridge II Note, the Hidden Ridge Bridge II Note had not matured, was not due, or Hidden Ridge did not owe the amount that Hillcrest claimed was due, and, therefore, Hidden Ridge denies the allegations in this paragraph.

72.     As to the allegations in paragraph 72 of the Complaint, Hidden Ridge states that the referenced letter is a written document and, therefore, speaks for itself.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.

73.     As to the allegations in paragraph 73 of the Complaint, Hidden Ridge states that the letter, attached as Exhibit X to the Complaint, is a written document and, therefore, speaks for itself.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast that document.  Further answering, the letter is a document produced by Hillcrest Bank.  Hidden Ridge lacks knowledge and information sufficient to form a belief as to whether the letter is a complete and accurate copy of the original, and, therefore, denies the same.

74.     As to the allegations in paragraph 74 of the Complaint, Hidden Ridge states that it did not owe the amounts that Hillcrest claimed was due in the letter, and, therefore, Hidden Ridge denies the allegations in this paragraph.

75. As to the allegations in paragraph 75 of the Complaint, Cordsen and the Trust state that the referenced letter is a written document and, therefore, speaks for itself. Cordsen and the Trust specifically deny any attempt by Hillcrest to recharacterize or recast that document.

76. As to the allegations in paragraph 76 of the Complaint, Cordsen and the Trust state that the letter, attached as Exhibit Y to the Complaint, is a written document and, therefore, speaks for itself. Cordsen and the Trust specifically deny any attempt by Hillcrest to recharacterize or recast that document. Further answering, the letter is a document produced by Hillcrest Bank. Cordsen and the Trust lack knowledge and information sufficient to form a belief as to whether the letter is a complete and accurate copy of the original, and, therefore, deny the same.

77. As to the allegations in paragraph 77 of the Complaint, Cordsen and the Trust state that they did not owe the amounts that Hillcrest claimed was due in the letter, and, therefore, Cordsen and the Trust deny the allegations in this paragraph.

78. As to the allegations in paragraph 78 of the Complaint, Winterberry states that due to Hillcrest's actions and course of conduct the Hillcrest was the first to breach the Winterberry Note, the Winterberry Note had not matured, was not due, or Winterberry did not owe the amount that Hillcrest claimed was due, and, therefore, Winterberry denies the allegations in this paragraph.

79. As to the allegations in paragraph 79 of the Complaint, Winterberry states that the Winterberry Loan Agreement and Winterberry Note are written documents and, therefore, speak for themselves. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast these documents. Further answering, Winterberry states that due to Hillcrest's actions and course of conduct Hillcrest was the first to breach the Winterberry Note, the Winterberry Note

had not matured, was not due, or Winterberry did not owe the amount that Hillcrest claimed was due, and, therefore, Winterberry denies the allegations in this paragraph.

80.     As to the allegations in paragraph 80 of the Complaint, Winterberry, Cordsen and the Trust state that the referenced letter is a written document and, therefore, speaks for itself. Winterberry, Cordsen and the Trust specifically deny any attempt by Hillcrest to recharacterize or recast that document.

81.     As to the allegations in paragraph 81 of the Complaint, Winterberry, Cordsen and the Trust state that the letter, attached as Exhibit Z to the Complaint, is a written document and, therefore, speaks for itself.  Winterberry, Cordsen and the Trust specifically deny any attempt by Hillcrest to recharacterize or recast that document.  Further answering, the letter is a document produced by Hillcrest Bank.   Winterberry, Cordsen and the Trust lack knowledge and information sufficient to form a belief as to whether the letter is a complete and accurate copy of the original, and, therefore, deny the same.

82.     As to the allegations in paragraph 82 of the Complaint, Winterberry, Cordsen and the Trust state that they did not owe the amounts that Hillcrest claimed was due in the letter, and, therefore, Winterberry, Cordsen and the Trust deny the allegations in this paragraph.

83.     As to the allegations in paragraph 83 of the Complaint, Cordsen admits that he met with Hillcrest Bank and that he refused to pay the amounts that Hillcrest claimed were due under the various loans because these amounts were incorrect.  Cordsen denies the remaining allegations in paragraph 82 of the Complaint.

84.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 84 of the Complaint, and, therefore, deny the same.

85.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 85 of the Complaint, and, therefore, deny the same.

86.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 86 of the Complaint, and, therefore, deny the same.

87.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 87 of the Complaint, and, therefore, deny the same.

88.     Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 88 of the Complaint, and, therefore, deny the same.

## COUNT I:  BREACH OF HIDDEN RIDGE LOT AND CONSTRUCTION LOAN GUARANTIES
### (Against Cordsen and the Trust)

89.     Defendants restate and incorporate their responses in paragraphs 1 through 88.

90.     Denied.

91.     Denied.

92.     As to the allegations in paragraph 92 of the Complaint, Cordsen and the Trust admit that demand was made on them for payment, but not for the proper amounts due.  Cordsen and the Trust deny the remaining allegations in this paragraph.

93.     As to the allegations in paragraph 93 of the Complaint, Cordsen and the Trust admit that demand was made on them for payment, but not for the proper amounts due.  Cordsen and the Trust deny the remaining allegations in this paragraph.

94.     Denied.

95.     Denied.

96.     As to the allegations in paragraph 96 of the Complaint, Cordsen and the Trust state that the referenced documents are written documents and, therefore, speak for themselves.

Cordsen and the Trust specifically deny any attempt by Hillcrest to recharacterize or recast these documents. Further answering, Cordsen and the Trust deny that Hillcrest is entitled to recover any fees from the cost of collection in that it is Hillcrest that first breached the agreements in question.

**WHEREFORE**, for the reasons set forth above, defendants Jack H. Cordsen and the Jack H Cordsen Trust UTA dated February 12, 2007, request that Hillcrest Bank take nothing on Count I of the Complaint, that the Complaint be dismissed, that a judgment be entered in favor of Cordsen and the Trust for their reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNT II: BREACH OF HIDDEN RIDGE BRIDGE I AND II LOAN GUARANTIES
### (Against Cordsen)

97.     Defendants restate and incorporate their responses in paragraphs 1 through 96.

98.     Denied.

99.     Denied.

100.    As to the allegations in paragraph 100 of the Complaint, Cordsen admits that demand was made on him for payment, but not for the proper amounts due. Cordsen denies the remaining allegations in this paragraph.

101.    Denied.

102.    Denied.

103.    As to the allegations in paragraph 103 of the Complaint, Cordsen states that the referenced documents are written documents and, therefore, speak for themselves. Cordsen specifically denies any attempt by Hillcrest to recharacterize or recast these documents. Further answering, Cordsen denies that Hillcrest is entitled to recover any fees from the cost of collection in that it is Hillcrest that first breached the agreements in question.

**WHEREFORE**, for the reasons set forth above, defendant Jack H. Cordsen requests that Hillcrest Bank take nothing on Count II of the Complaint, that the Complaint be dismissed, that a judgment be entered in favor of Cordsen for his reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNT III:  BREACH OF HIDDEN RIDGE LOT LOAN AGREEMENT AND NOTE, HIDDEN RIDGE CONSTRUCTION AGREEMENT AND NOT, HIDDEN RIDGE BRIDGE I AND II LOAN AGREEMENTS AND NOTES
### (Against Hidden Ridge Building Corporation)

104.    Defendants restate and incorporate their responses in paragraphs 1 through 103.

105.    Denied.

106.    As to the allegations in paragraph 106 of the Complaint, Hidden Ridge admits that demand was made on it for payment, but not for the proper amounts due.  Hidden Ridge denies the remaining allegations in this paragraph.

107.    Denied.

108.    Denied.

109.    As to the allegations in paragraph 109 of the Complaint, Hidden Ridge states that the referenced documents are written documents and, therefore, speak for themselves.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast these documents. Further answering, Hidden Ridge denies that Hillcrest is entitled to recover any fees from the cost of collection in that it is Hillcrest that first breached the agreements in question.

110.    As to the allegations in paragraph 110 of the Complaint, Hidden Ridge states that the deeds of trust are written documents and, therefore, speak for themselves.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast those documents.

**WHEREFORE**, for the reasons set forth above, defendant Hidden Ridge Building Corporation requests that Hillcrest Bank take nothing on Count III of the Complaint, that the

Complaint be dismissed, that a judgment be entered in favor of Hidden Ridge for its reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

<h3 style="text-align:center">COUNT IV:  BREACH OF WINTERBERRY GUARANTIES</h3>
<strong>(Against Cordsen and the Trust)</strong>

111.    Defendants restate and incorporate their responses in paragraphs 1 through 110.

112.    Denied.

113.    Denied.

114.    As to the allegations in paragraph 114 of the Complaint, Cordsen and the Trust admit that demand was made on them for payment, but not for the proper amounts due.  Cordsen and the Trust deny the remaining allegations in this paragraph.

115.    Denied.

116.    As to the allegations in paragraph 116 of the Complaint, Cordsen and the Trust state that the referenced documents are written documents and, therefore, speak for themselves. Cordsen and the Trust specifically deny any attempt by Hillcrest to recharacterize or recast these documents.  Further answering, Cordsen and the Trust deny that Hillcrest is entitled to recover any fees from the cost of collection in that it is Hillcrest that first breached the agreements in question.

117.    As to the allegations in paragraph 117 of the Complaint, Cordsen and the Trust state that the deeds of trust are written documents and, therefore, speak for themselves.  Hidden Ridge specifically denies any attempt by Hillcrest to recharacterize or recast those documents.

**WHEREFORE**, for the reasons set forth above, defendants Jack H. Cordsen and the Jack H Cordsen Trust UTA dated February 12, 2007, request that Hillcrest Bank take nothing on Count IV of the Complaint, that the Complaint be dismissed, that a judgment be entered in favor

of Cordsen and the Trust for their reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF THE WINTERBERRY LOAN AGREEMENT AND WINTERBERRY NOTE
### (Against Winterberry Development, LLC)

118.    Defendants restate and incorporate their responses in paragraphs 1 through 118.

119.    Denied.

120.    As to the allegations in paragraph 120 of the Complaint, Winterberry admits that demand was made on it for payment, but not for the proper amounts due.  Winterberry denies the remaining allegations in this paragraph.

121.    Denied.

122.    Denied.

123.    As to the allegations in paragraph 123 of the Complaint, Winterberry states that the referenced documents are written documents and, therefore, speak for themselves. Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast these documents.  Further answering, Winterberry denies that Hillcrest is entitled to recover any fees from the cost of collection in that it is Hillcrest that first breached the agreements in question.

124.    As to the allegations in paragraph 124 of the Complaint, Winterberry states that the deeds of trust are written documents and, therefore, speak for themselves.  Winterberry specifically denies any attempt by Hillcrest to recharacterize or recast those documents.

**WHEREFORE**, for the reasons set forth above, defendant Winterberry Development, LLC requests that Hillcrest Bank take nothing on Count V of the Complaint, that the Complaint be dismissed, that a judgment be entered in favor of Winterberry for its reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

## AFFIRMATIVE DEFENSES

For their affirmative defenses to Hillcrest's Complaint, Defendants state as follows:

1.      Hillcrest's Complaint fails to state a claim upon which relief can be granted against Defendants because of Hillcrest's actions and conduct as set forth in Defendants' Counterclaim against Hillcrest and other plaintiffs, which rescinds or negates the loan documents such that there is no obligation that Defendants owe to Hillcrest under the loan documents.

2.      Hillcrest's claims are barred by its conduct and actions and by the doctrine of unclean hands.

3.      Hillcrest's claims are barred by the doctrines of waiver, estoppel, and laches based on the actions and conduct set forth in Defendants Counterclaim against Hillcrest and Cross-Claim against other defendants.

4.      Hillcrest's claims are barred by the doctrine of comparative fault.

5.      Hillcrest's claims are barred in that it has failed to mitigate its alleged damages, if any.

6.      Defendants reserve the right to plead any additional defenses as they become known through discovery in this case.

**WHEREFORE**, for the reasons set forth above, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA request that Hillcrest Bank take nothing, that the Complaint be dismissed, and that a judgment be entered in Defendants' favor for its reasonable attorneys' fees and costs, and for such other and further relief as this Court deems just and proper.

## COUNTERCLAIM
**(Count I - Fraudulent Misrepresentation against Rice and Forgey; Count II - Fraudulent Misrepresentation against Rice; Count III - Fraudulent Nondisclosure against Rice and Forgey; Count IV - Fraudulent Misrepresentation against Rice; Count V - Negligent**

Misrepresentation against Rice and Forgey; Count VI - Breach of Fiduciary Duty against Rice; Count VII - Negligent or Reckless Failure to Supervise against the Directors)

Defendants Jack H. Cordsen ("**Cordsen**"), Jack H. Cordsen Trust UTA (the "**Trust**"), Hidden Ridge Building Corporation ("**Hidden Ridge**"), and Winterberry Development, LLC ("**Winterberry**," and with Cordsen, the Trust, and Hidden Ridge, sometimes collectively, the "**Defendants**"), by their counsel, and for their claims and causes of action (the "**Counterclaim**") against plaintiff/counterclaim defendant Hillcrest Bank ("**Hillcrest**") and counterclaim defendants Donna Rice ("**Rice**"), Jeffrey F. Wheeler ("**Wheeler**"), Jon Forgey ("**Forgey**"), Thomas Dreyer ("**Dreyer**"), Jack Fingersh ("**J. Fingersh**"),  Paul Fingersh ("**P. Fingersh**"), George Lieberman ("**Lieberman**"), Jerry M. White ("**White**"), and Scott Asner ("**Asner**," and with Wheeler, Dryer, J. Fingersh, P. Fingersh, Lieberman, and White, collectively, the "**Directors**"), respectfully state and allege as follows:

## PARTIES AND VENUE

1.      Upon information and belief, Hillcrest is a national banking association with its main offices according to its articles of association located in the State of Kansas.

2.      Upon information and belief, Rice is an individual who may be served with process at 1100 NW South Outer Road, Blue Springs, Missouri 64015.

3.      Upon information and belief, Wheeler is an individual who may be served with process at 3309 West 127th Street, Leawood, Kansas 66209.

4.      Upon information and belief, Forgey is an individual who may be served with process at 910 Northwest Cedar Lane, Grain Valley, Missouri 64029.

5.      Upon information and belief, Dreyer is an individual who may be served with process at 1232 West 61st Street, Kansas City, Missouri 64113.

6.     Upon information and belief, J. Fingersh is an individual who may be served with process at 4400 West 87th Place, Overland Park, Kansas 66207.

7.     Upon information and belief, P. Fingersh is an individual who may be served with process at 655 West 61st Terrace, Kansas City, Missouri 64113.

8.     Upon information and belief, Lieberman is an individual who may be served with process at 11504 Juniper Drive, Leawood, Kansas 66211.

9.     Upon information and belief, White is an individual who may be served with process at 1912 W 61st Terrace, Prairie Village, Kansas 66208.

10.     Upon information and belief, Asner is an individual who may be served with process at 11000 King Street, Overland Park, Kansas 66210.

11.     The Court has subject matter jurisdiction over this action in that Plaintiffs and Defendants are citizens of different states and the amount in controversy in Hillcrest's Complaint exceeds $75,000, as authorized under 28 U.S.C. § 1332.

12.     The Court has personal jurisdiction over the Plaintiff's in that the actions and conduct that form the basis for Defendants' Counterclaim occurred in Missouri.

13.     Venue is proper in this Court because a substantial number of the parties reside in Missouri and all of the actions and conduct of Plaintiffs occurred in Missouri.

## BACKGROUND FACTS

14.     Hillcrest, through Rice and others, consistently sought banking business from Cordsen and his related entities for more than 15 years dating back to the 1990's.

*I.     Hillcrest's Initiation of Relationship.*

15.     During that time period, Hillcrest and Cordsen, through a sequence of conduct, established a common basis of understanding and a course of dealing and performance in the manner that they conducted their business and the affairs of Cordsen and his related entities.

16.     Cordsen has been a real estate developer in Eastern Jackson County, Missouri, for 51 years.

17.     Prior to working with Hillcrest, Cordsen had banking relationships with other financial institutions, but Hillcrest courted Cordsen and told him that it could handle all of his financing needs for his development projects.

18.     When Hillcrest first approached Cordsen to do business, Hillcrest, through Rice, prepared loan documents for Cordsen and his entities to execute.

19.     Cordsen extensively reviewed the documents and requested many changes because the "form" documents had several irrelevant and immaterial provisions, many items in the documents were inconsistent with, or inapplicable to, the transactions at issue, or were inconsistent with the parties' understandings.

20.     Hillcrest, through Rice, advised Cordsen that it understood that these were basic "form documents," but that Hillcrest was unwilling to customize the documents for each transaction because it could not vary from its forms.

21.     Hillcrest, through Rice, asked Cordsen to "trust" Hillcrest because these documents had been used in hundreds of other transactions with other builders and developers.

22.     Rice informed Cordsen that Hillcrest wanted to keep its documents "simple" because the parties, at the end of the day, would not be doing business with one another unless they "trusted" each other.

23.     Accordingly, Hillcrest refused to make any changes.

## II.    The Continuation of the Business Relationship

24.    Eventually, Hillcrest had become the exclusive financing source for Cordsen and many of his entities.

25.    Additionally, the relationship with Hillcrest was so complete that Cordsen moved most of his liquid capital into accounts at Hillcrest.

26.    To complete Cordsen's projects that Hillcrest financed, there was a relationship of trust between Cordsen and Hillcrest relating to the nature of the financing for Cordsen's projects.

27.    Specifically, until the latter extensions and renewals of the loans at issue in the above-captioned action, Hillcrest provided 100% financing to Cordsen and his entities for the projects that Hillcrest financed.  In fact, Hillcrest never required any collateral or other security from Cordsen, other than the project itself, to secure repayment of the loans or guaranties on these projects.

28.    Moreover, Hillcrest always provided the Cordsen entities with an interest reserve on all of the projects that Hillcrest financed for Cordsen.  During their entire lending relationship, Hillcrest never required Cordsen to come out-of-pocket and pay any interest on a project loan, except in the last months of the relationship when for the first time Hillcrest demanded that Cordsen pay interest on his Personal Home (as discussed below).

29.    Over the years, Rice and others at Hillcrest told Cordsen that he could rely on Hillcrest to conduct its business with the highest standards of honesty and fairness because the bank was working to build relationships with key important people in the development industry, including Cordsen.

30.    Rice stated to Cordsen that Hillcrest's Ethics Policy held the bank to high standards, including compliance with the spirit, as well as the letter, of the law.

31. Rice, as Hillcrest's representative, openly told Cordsen that she believed that Hillcrest had a "fiduciary" relationship with Cordsen, as one of Hillcrest's key customers and this was part of the bank's Ethics Policy.

32. In fact, Rice continued to confirm this special relationship with Cordsen from 2004 through 2009 when Hillcrest investigated, analyzed, and ultimately financed the project for Hidden Ridge (the "**Hidden Ridge Project**") and the project for Winterberry (the "**Winterberry Project**").

33. Hillcrest openly advertised these fiduciary relationships and high standards of honesty and fairness as part of its strategy with its key customers. Rice stated to Cordsen that he was one of the customers that Hillcrest wanted to hold itself out to as a financial institution that held itself to the highest ethical standards in the banking industry.

### III. Rice and Forgey acted as Cordsen's sole contact with Hillcrest

34. During his entire relationship with Hillcrest, Cordsen's primary contacts with Hillcrest were through communications with Rice and Forgey. Rice and Forgey developed a personal relationship with Cordsen and was intimately involved in Cordsen's business enterprises.

35. During the course of Cordsen's relationship with Hillcrest, Rice had hundreds of telephone conversations with Cordsen and Rice and Forgey personally met with him more than a hundred times to discuss and give advice to Cordsen on various personal and business financial matters.

36. Hillcrest repeatedly held itself out to Cordsen as his trusted financial resource. Hillcrest would use phrases with Cordsen such as "partner" and "trusted financial resource" to

illustrate the relationship it forged with Cordsen as part of the bank's strategy to provide added value thereby distinguishing itself from its competitors.

37.     Hillcrest, through Rice and Forgey, promoted the bank to Cordsen as a partner, someone who could put deals together; the bank communicated to Cordsen that they had a special relationship with him as part of the bank's efforts to expand in the real estate development market.

38.     Hillcrest, through Rice, and in the presence of Forgey, told Cordsen that she wanted him to rely on Hillcrest for its advice and counsel, as a trusted financial resource, in finding a way to put deals together for Cordsen's projects.

39.     Cordsen held Rice and Forgey in high regard and placed his trust in them. Cordsen relied heavily on Rice and Forgey as his business partners and trusted financial resources in both his personal and business financial affairs.  And Rice and Forgey knew that Cordsen relied on them for this advice.

40.     Rice and Forgey communicated to Cordsen that Hillcrest considered Cordsen to be an excellent and profitable customer with whom the bank wanted to continue and expand the relationship.

IV.     *Hidden Ridge and Winterberry Projects*

41.     The Hidden Ridge Project involves 44 buildings, with each building consisting of four condominium units.  At the beginning of Hillcrest's financing for the Hidden Ridge Project, Hidden Ridge would purchase the lot for a building, construct the building, and sell the condominium units.

42.     Hillcrest provided 100% financing for the Hidden Ridge Project.

43.     As Hidden Ridge bought lots, constructed the buildings, and sold the condominium units, it would pay down the Hidden Ridge loans and then re-borrow funds to buy lots, build buildings, and sell additional units.

44.     This course of action continued for nearly six years, as evidenced by the numerous modifications to the original promissory notes for the Hidden Ridge Project.

45.     Prior to Hillcrest abruptly changing its course of conduct and dealings with Cordsen and his related entities, Hidden Ridge adopted a second marketing strategy for the Hidden Ridge Project involving the rental of unsold condominium units to customers and then selling the rented buildings to investors who desired the cash flow.

46.     At all times relevant to this lawsuit, and prior to Hillcrest calling the Hidden Ridge promissory notes due, the Hidden Ridge Project was generating sufficient cash flow to service all of Hidden Ridge's debt to Hillcrest.

47.     Hillcrest was brokering the Winterberry Project to Cordsen as part of a larger development involving two other key bank customers, Bruce Barnhart and Jim Thorpe.

48.     The loan on the Winterberry Project was for Winterberry to perform all of the internal development work on the Winterberry Project and then sell individual lots for construction of residential homes.

49.     Winterberry provided Hillcrest with detailed budgets for the Winterberry project; everything from cost of the land to construction of all infrastructure.  As was the ordinary and customary course of action and practice between Hillcrest and Cordsen, Hillcrest provided a one-year promissory note for 100% of the financing for the Winterberry Project.

50.     Keeping with the ordinary and customary course of action and practice between Hillcrest and Cordsen by virtue of the special relationship between the parties, Hillcrest did not

require any collateral or security, other than the projects themselves, to secure the obligations of Hidden Ridge or Winterberry at loan origination.

51.     The Hidden Ridge and Winterberry financing transactions, including 100% financing and no additional collateral or security, was in keeping with all prior financing relationships between Hillcrest and Cordsen based on Cordsen being a key customer and partner of Hillcrest and a person in whom Hillcrest wanted to expand and grow the relationship.

52.     Hillcrest, through Rice, informed Cordsen that the bank had a limited number of real estate developer customers who Hillcrest financed 100%.

53.     On both the Winterberry and Hidden Ridge Projects, Cordsen told Rice and Forgey, that he needed assurances from the bank that there would be guaranteed financing for the entire project, that Hillcrest commit to each project through completion, and that Cordsen would make no cash investment in the projects.

54.     Hillcrest's acknowledgement and acceptance of Cordsen's requests is tellingly demonstrated in the Hidden Ridge Project where two of the original loans matured in one year, but Hillcrest renewed and extended the loans for an additional five years, in increments, as had been Hillcrest's ordinary custom and practice on past loans it made to Cordsen's entities for other real estate development projects.

55.     Based on the special relationship between Hillcrest and Cordsen, he relied on Hillcrest's representations that he was a key customer for the bank, that the bank was a partner and trusted financial resource, and that the bank practiced the highest standards of honesty and fairness when Hillcrest induced him to obtain the Winterberry loan on the Winterberry Project with a one-year maturity.

56.     At the time that Hillcrest made the Winterberry loan, it knew that the Winterberry Project, specifically construction of all infrastructure to begin selling lots, would not be completed within the one-year term of the promissory note.  That is because Hillcrest knew that Winterberry could not even begin construction of the infrastructure on the Winterberry Project until Barnhart and Thorpe, other Hillcrest key customers, completed their agreements with Winterberry to bring roads and utilities to the Winterberry Project.

57.     Hillcrest further knew that Winterberry would not purchase the Winterberry property or obtain the Winterberry Project financing unless and until Hillcrest financed the entire amount of the Barnhart and Thorpe project because the Winterberry Project was worthless and landlocked if Thorpe and Barnhart did not bring the roads and utilities from their project to the Winterberry Project.

58.     Hillcrest was intimately involved in the Barnhart and Thorpe project and the Winterberry Project in the follow respects:

     a)     Hillcrest knew of the agreement between Barnhart and Thorpe and Winterberry for bringing roads and utilities to the Winterberry Project;

     b)     Hillcrest knew that Winterberry could not begin full construction of the Winterberry infrastructure without the roads and utilities;

     c)     Hillcrest knew that it was providing 100% of the financing for the Barnhart and Thorpe project and the Winterberry Project based on the budgets that were provided to Hillcrest;

     d)     Hillcrest knew that Winterberry would not proceed with the purchase and financing for the Winterberry Project unless Hillcrest financed the entire amount of the Barnhart and Thorpe project because the Winterberry Project was worthless and landlocked if Thorpe and Barnhart did not bring the roads and utilities from their project to the Winterberry Project; and

     e)     Hillcrest knew that at loan origination neither of the projects could be completed within the initial one-year term of the loans.

59.     Hillcrest, through Rice and Forgey, assured Cordsen that it could finance 100% of the Winterberry Project and that it had plenty of capital so that Cordsen would not have to worry about running short of the funds necessary to complete the Winterberry Project.

60.     As part of the 100% financing commitment on each project that Cordsen financed with Hillcrest over 15 years, Hillcrest never told Cordsen that there was any minimum loan to value ratio that the projects had to maintain or any other factors that could affect complete financing and completion of a project, as evidenced by the nearly 18 renewals on one of the Hidden Ridge loans.

V.      *Rice's Representations to Cordsen*

61.     After gaining Cordsen's trust through 100% financing on several projects with no out-of-pocket interest expense, Rice, in the presence of Forgey, made numerous representations to Cordsen about the Hidden Ridge Project and the Winterberry Project:

    a)    Hillcrest would finance both projects as long as it took to build out the Hidden Ridge Project and to develop all infrastructure and sell all of the lots in the Winterberry Project;

    b)    Hillcrest would provide funding for all costs, including, without limitation, interest, infrastructure costs, etc. on the Winterberry Project;

    c)    Hillcrest would maintain its commitment to fund the Hidden Ridge Project to completion;

    d)    Hillcrest would maintain its commitment to fund the Winterberry Project to the maximum amount of the original promissory note;

    e)    Hillcrest would not change its custom and practice with Cordsen by demanding additional collateral from Cordsen and when reminded of this representation, Hillcrest represented that it only needed the additional collateral for two months to satisfy examiners because of a golf course development that went south in Arizona;

    f)    Hillcrest represented that it would release the requested additional collateral after two months;

g)  Hillcrest represented that even though the development market had slowed, it was prepared to fully finance both the Barnhart and Thorpe project and the Winterberry Project because it had plenty of capital and the fact that Cordsen had informed the bank that he would not do the Winterberry Project if the bank did not fulfill its original lending commitment; and

h)  Hillcrest ran its business with the highest standards for honesty and fairness and that it believed it was a partner with Cordsen on the successful completion of his projects.

62.  Throughout all of his dealings with Hillcrest, there is no doubt that Hillcrest, through Rice and Forgey, pushed a "no cash investment" structure on all Cordsen projects that Hillcrest financed, including, without limitation, the Hidden Ridge Project and the Winterberry Project.

63.  There were no regulatory pressures on Hillcrest from 2004 through 2007 when the Hidden Ridge and Winterberry deals were put together and financed, and, therefore, Hillcrest never said anything to Cordsen that if the regulatory environment changes, we will want to get out of our commitments to you.

64.  The fact that Hillcrest perceived it had plenty of capital was an advantage that Rice used with Cordsen and other key customers.

VI.  *Hillcrest's Change in Its Ordinary and Customary Practices with Key Customers*

65.  In 2009, Hillcrest, through Rice and in the presence of Forgey, told Cordsen of problems with a golf course development in Arizona. Rice asked Cordsen and other key customers to pledge additional collateral as security for their loans with Hillcrest even though Hillcrest induced Cordsen to take out the loans for Winterberry and Hidden Ridge without any additional collateral. Rice, in the presence of Forgey, informed Cordsen and other key customers that the pledge of the collateral was short term, approximately two months, and necessary to satisfy bank examiners because of the golf course development debacles.

66.     Rice, in the presence of Forgey, further represented that the additional collateral was not necessary for the existing Hidden Ridge and Winterberry loans, other than to satisfy the bank examiners on the entire real estate development portfolio, which included the golf course development debacle.

67.     Having been induced to obtain the financing on the Winterberry Project and Hidden Ridge Project without any additional collateral being pledged, Cordsen, in reliance on these representations, and Hillcrest's prior representations to conduct its business with the highest standards of honesty and fairness, pledged two homes, one at the Lake of the Ozarks for the Hidden Ridge Project and the other his personal residence (collectively, the "**Additional Collateral**"), as additional collateral for the Winterberry and Hidden Ridge loans.

68.     In June of 2009, at the offices of Hillcrest, when Cordsen communicated his unwillingness to pledge the Additional Collateral, even on a short term basis, Rice, in the presence of Forgey, told him that "Jack, the bank doesn't want your house."  Rice, in the presence of Forgey, further represented to Cordsen the problems that Hillcrest was having with the Arizona golf course development and asked Cordsen to "help us out."

69.     Cordsen repeatedly asked Rice and Forgey for the release of the Additional Collateral after the two months expired, but Hillcrest, through Rice, informed him that the Bank was still working through the golf course development debacle.

70.     Additionally during this time period, Hillcrest reneged on its promise that it was prepared to fully finance both the Barnhart and Thorpe project and the Winterberry Project. Although its prior course of dealing and conduct with Cordsen and his entities was to renew and extend promissory notes for the same principal amount so that Hillcrest could deliver on its promise of no cost, 100% financing to Cordsen, and Hillcrest's representations that it would fund

the full amount of the original Winterberry loan to induce Cordsen to finance the Winterberry project, Hillcrest capped the Barnhart and Thorpe promissory note and the Winterberry promissory note at their then principal balance and denied both sets of developers the opportunity to complete their respective developments.

71.     Further, Hillcrest, in direct contravention of its inducement to Cordsen to finance the entire amount of original loans for the Barnhart and Thorpe loans and the Winterberry loan, demanded that Winterberry make a principal pay down on the Winterberry loan to obtain a renewal of that loan.

72.     This requirement for a principal pay down was outside of Hillcrest's prior course of dealing and conduct with Cordsen and his entities.

73.     Hillcrest further violated its prior course of dealing and conduct with Cordsen, by refusing to advance further funds on the Hidden Ridge Project even though the Hillcrest loan committee had approved additional financing to complete the remaining construction on the Hidden Ridge Project.

74.     Further, Hillcrest, in direct contravention of its inducement to Cordsen to finance the entire amount of the Hidden Ridge Project, demanded that Hidden Ridge make a principal pay down on the Hidden Ridge loan to obtain a renewal of that loan.

VII.     *Sale of Cordsen's Lake of the Ozarks Home.*

75.     In April 2010, Cordsen sold his Lake of the Ozarks home (the "**Lake Home**").  It appraised at over $2.5 million, but he had to accept a $1.6 million contract so that he could make the payments that Hillcrest suddenly insisted on despite their prior inducement to Cordsen to provide no cost, 100% financing on the Hidden Ridge Project and the Winterberry Project.

76. Cordsen, pursuant to Rice's prior representations and inducements to pledge the Additional Collateral for two months, asked Rice and Forgey to release the deed of trust on the Lake Home so that he could use the proceeds to finish the Winterberry Project. Cordsen needed to finish the infrastructure development in the Winterberry project so that he could sell the lots to repay Hillcrest the monies he owed on the Winterberry promissory note.

77. Hillcrest, through Rice and Forgey, represented to Cordsen that it agreed with his application of the sale proceeds from the Lake Home.

78. Despite Rice and Forgey's prior representations concerning the Additional Collateral, Hillcrest took all of the proceeds from the sale of the Lake Home, and applied the funds in a manner different than their representations and inducement to Cordsen. This left Cordsen completely exposed to Hillcrest on the Winterberry loan.

79. Additionally, and without Cordsen's consent, Hillcrest paid off the first mortgage on Cordsen's personal residence (the "**Personal Home**") and raised the amount of the lien from approximately $310,000 to $589,000 even though the bank represented and induced Cordsen to pledge the Personal Home with the promise of release in two months and to keep the lien amount at $310,000.

80. Hillcrest took all of these actions after Rice, in the presence of Forgey, promised Cordsen that specifically told Cordsen: "Jack, the bank doesn't want your house."

81. Because of Hillcrest's questionable lending practices with real estate development loans, it was taken over by the FDIC and sold to another company.

VIII. *Hillcrest's Kill Strategy*

82. In 2007, Hillcrest met with Cordsen, Mr. Thorpe, and Mr. Barnhart to discuss their two projects. During that meeting, Cordsen informed Hillcrest that Winterberry would not purchase the Winterberry Project or obtain the Winterberry loan if Hillcrest did not commit to

full funding of all amounts necessary to complete both projects. Cordsen needed these assurances from Hillcrest because the Winterberry Project was landlocked without the roads and utilities from the Barnhart and Thorpe project. Moreover, Cordsen knew that he could never pay back the Winterberry loan if he did not finish the infrastructure development in the Winterberry Project because he would not be able to sell any lots.

83.     Hillcrest approved the loans to Winterberry for the Winterberry Project and to Barnhart and Thorpe for their project. The principal amount of the loans was the exact amount of money needed to complete the projects pursuant to the budgets that both sets of developers provided to Hillcrest.

84.     After Rice, in the presence of Forgey, told Cordsen "Jack, the bank doesn't want your house," and after Cordsen relied on this representation in pledging the Additional Collateral, Hillcrest subsequently reduced the principal balance of both Cordsen's loans and the Barnhart and Thorpe loans to the amount that had been drawn to date on the projects, essentially killing both projects.

85.     Moreover, Hillcrest killed the Hidden Ridge Project by failing to deliver promised financing for construction of the remaining buildings on the project, even though Hillcrest's loan committee had approved the financing for at least one of the buildings.

86.     Killing the Hidden Ridge Project took Cordsen and Hidden Ridge by complete and utter surprise in that the Hidden Ridge Project was cash flowing sufficient monies to service the debt to Hillcrest.

87.     Subsequent to Hillcrest killing the Hidden Ridge Project, the Winterberry Project, and the Barnhart and Thorpe project, Cordsen learned that Hillcrest was taking this same kill strategy with other key customers in Eastern Jackson County, Missouri.

88.    Hillcrest's kill strategy involved obtaining additional collateral from key borrowers or guarantors when Hillcrest had never requested this type of security in 15 plus years of dealings with these key customers and demanding high dollar principal pay downs on the loans, which the bank had never required from these key customers.

89.    When Cordsen pressed Hillcrest as to why it was killing his projects, Rice, in the presence of Forgey, stated that Hillcrest believed it was insecure on the projects. Cordsen pushed Rice and Forgey for more details on this alleged insecurity, but they were not forthcoming, except to admit that Hillcrest had not updated any appraisals on the projects.

90.    Additionally, the Additional Collateral that Hillcrest requested was procured by fraud, including, without limitation, the following:

a)    Rice approached Cordsen to pledge additional collateral on their projects for a two month period to help the bank with its examiners because of a problem with a golf course development in Arizona;

b)    Cordsen questions Rice about why he needed to pledge the Additional Collateral, and Rice told him that it had nothing to do with the Winterberry Project or the Hidden Ridge Project;

c)    Rice told Cordsen that Hillcrest needed additional collateral from many of its key customers so that overall the golf course development debacle would not look so bad to the bank examiners;

d)    In June of 2009, at the offices of Hillcrest, Cordsen informed Rice, in the presence of Forgey, that he did not want to pledge the Additional Collateral because it constituted his retirement, but Rice responded by telling Cordsen that "Jack, the bank doesn't want your house" and that "he needed to help us out";

e)    Forgey was present when Rice made the June 2009 statements described above.

f)    Rice further stated that if Cordsen helped the bank out with this problem, Hillcrest would help him even more in the future;

g)    Rice told Cordsen that the Additional Collateral would be released within 60 days, which was the time period she stated was necessary to clean up the golf course development debacle;

h)      Rice further informed Cordsen that the Additional Collateral was only being used for the purpose set forth above because Hillcrest had not updated any appraisals on the Winterberry Project or the Hidden Ridge Project to know whether the bank was insecure on either project;

i)      Cordsen visited Hillcrest on numerous occasions after pledging the Additional Collateral to ask Rice and Forgey where he stood with the bank releasing the collateral. On each occasion, Rice informed Cordsen that the release would occur shortly because Hillcrest was almost finished with the golf course development debacle;

j)      All statements of past good will and mutually beneficial experiences appeared to create an environment of good feeling with Cordsen; Rice and Forgey never let on to Cordsen or once said that the bank would not release the Additional Collateral upon solving its problems with the golf course development;

k)      Hillcrest never advised Cordsen of the bank's kill strategy outlined above; and

l)      Hillcrest never advised Cordsen or his entities that after obtaining the Additional Collateral, the bank was going to effectively kill the above-stated projects by also demanding huge principal pay downs on the loans.

91.      Hillcrest's fraudulent and reckless conduct is chilling when you consider that its plan to kill Cordsen's loans occurred at the same time as Hillcrest requested the Additional Collateral without obtaining any updated appraisals on the Winterberry Project, the Hidden Ridge Project, or the other projects that the bank killed with this strategy.

92.      Hillcrest knew of these regulatory pressures even when Rice and other represented to Cordsen, Mr. Barnhart, and Mr. Thorpe that Hillcrest would completely fund the Winterberry Project and the project of Mr. Barnhart and Mr. Thorpe at loan origination.

93.      What Hillcrest failed to tell Cordsen was that the bank had a secret plan that once it obtained the excess Additional Collateral from Cordsen that Hillcrest was going to immediately come back and start demanding huge principal pay downs on his loans in exchange for short term loan renewals.

94.     As part of this secret scheme, Hillcrest went to very short three-month renewal periods on Cordsen's loans with Hillcrest so that Hillcrest could continually demand more and more principal pay downs at a time when Hillcrest had killed the Winterberry Project by not advancing all of the monies the bank promised to provide.

95.     Once Hillcrest had the signed documents for the Additional Collateral, it engaged in a systematic and calculated scheme to kill the Hidden Ridge Project, the Winterberry Project, and the Barnhart and Thorpe project, even though the bank had induced Cordsen to obtain the Winterberry loan by promising that it would fund completely the Barnhart and Thorpe project.

IX.     *As Part of Hillcrest's Kill Strategy, It Failed to Properly Apply the Sale Proceeds from the Lake Home.*

96.     When it became apparent that Hillcrest was invoking its kill strategy against Cordsen, he was forced to sell the Lake Home for more than a $1 million less than its appraised value so that he could meet Hillcrest's financial demands on projects that the bank had agreed to fully finance.

97.     Cordsen approached Hillcrest about releasing the lien on the Lake Home pursuant to the parties' agreement when Hillcrest induced Cordsen to pledge the Additional Collateral, but the bank refused.

98.     Additionally, Cordsen sat down with Rice and Forgey to work through the distribution of the sale proceeds. Cordsen communicated to Rice and Forgey that his intent was to funnel most of the sale proceeds to the Winterberry Project in an effort to keep that loan alive so that he could finish the development and sell the lots to repay the Winterberry loan. Rice, Forgey and Cordsen agreed on an application of the sale proceeds from the Lake Home.

99.     In contravention of that agreement, and in furtherance of its kill strategy, Hillcrest applied the sale proceeds in a different manner, including, without limitation, paying off the first

lien on the Personal Home and then increasing the maximum lien amount under the deed of trust, which Cordsen never agreed to do, and paying off or down Hidden Ridge loans so that very little, if any, of the sale proceeds went to the Winterberry Project.

100.    The fact is that Hillcrest was on a course to try and seize all of the Additional Collateral from Cordsen.  Specifically, Hillcrest has set a foreclosure sale date of December 10, 2010 on the Personal Home even though there is no default under the deed of trust.

101.    When Cordsen questioned Rice and Forgey about the application of funds from the sale of the Lake Home, Rice told Cordsen that the bank could do whatever it wanted with the money.

102.    Moreover, Hillcrest has initiated a foreclosure of the Winterberry property even though no default exists under the deed of trust and without conducting any investigation into the complaints of its key customer, Cordsen, concerning Hillcrest's failure to comply with the agreements it has with Cordsen.

X.      *Hillcrest's Reckless Indifference in Breaching Its Agreement on the Winterberry Project.*

103.    Hillcrest induced Cordsen to enter into the Winterberry loan with the assurances and promises that the bank would fully fund the Winterberry Project based on the budget that became the principal amount of the Winterberry loan and that the bank would fully fund the Barnhart and Thorpe project so that the Winterberry Project would not be landlocked without roads and utilities.

104.    Midstream, and in furtherance of its kill strategy, Hillcrest reduced and capped the principal amount of the Winterberry loan at the amount that had been drawn from the construction loan to that date even though the Winterberry Project was not complete and could not be completed without the full amount of the original Winterberry loan.

105.     Additionally, and in contravention of its inducement to Cordsen, Hillcrest further capped the Barnhart and Thorpe loan at the amount that had been drawn from the construction loan to that date even though their project was not complete, the roads and utilities had not been delivered to the Winterberry Project as agreed, and their project could not be completed without the full amount of the original project loan.

106.     Hillcrest engaged in these activities knowing that Cordsen, Barnhart, and Thorpe neither had the available funds, nor the ability to obtain replacement financing, to complete their projects.  This completed Hillcrest's strategy to kill both projects and foreclose on the Winterberry Project even though it was Hillcrest that caused the default.

XI.     *Hillcrest's Actions to Kill the Winterberry Project and the Hidden Ridge Project Were In Response to the Bank's Own Bad Decisions on Other Loans.*

107.     After making the Winterberry loan, Hillcrest informed Cordsen on numerous occasions that it had to cut back on its real estate development lending due to the Arizona golf course development debacle.

108.     Upon information and belief, Hillcrest was having regulatory issues with its capital structure related to loans that had nothing to do with the Winterberry or Hidden Ridge loans.

109.     Because of the Hillcrest's own actions in other lending, it changed its course of conduct and practice with Cordsen and his entities by killing the Hidden Ridge Project and the Winterberry Project.

110.     Hillcrest's actions in obtaining the Additional Collateral and then sinking the Hidden Ridge Project and the Winterberry Project, notwithstanding its commitment to Cordsen and Winterberry that the bank would fully fund the Winterberry Project, demonstrate that Hillcrest acted in a concerted effort after it obtained the Additional Collateral from Cordsen to

orchestrate a series of actions against the Winterberry Project and the Hidden Ridge Project by, including, without limitation, failing to fully fund the Winterberry Project, failing to fully fund the Barnhart and Thorpe project, failing to advanced approved funds for the construction of additional buildings at the Hidden Ridge Project, and failing to apply the proceeds from the sale of the Lake Home in the manner that the parties' agreed.

## COUNT I – FRAUDULENT MISREPRESENTATION
### (Against Rice and Forgey)

111.    Defendants incorporate paragraphs 1 through 110 above.

112.    Winterberry, Cordsen, and the Trust (collectively, the "**Winterberry Defendants**") entered into the Winterberry loan (the "**Winterberry Loan**"), including, without limitation, notes, loan agreements, modifications, guaranties, modification of the guaranties, deeds of trust, and other documents that these defendants signed (the "**Winterberry Loan Documents**").

113.    Hidden Ridge and Cordsen entered into the Hidden Ridge loans (the "**Hidden Ridge Loans**"), including, without limitation, notes, loan agreements, modifications, guaranties, modification of the guaranties, deeds of trust, and other documents that these defendants signed (the "**Hidden Ridge Loan Documents**").

114.    Rice and Forgey made representations to Cordsen, as described with particularity below:

       a)      On various dates in July of 2008;

       b)      Cordsen met with Rice, Forgey, Barnhart and Thrope;

       c)      At the offices of Hillcrest Bank located on 1100 N.W. South Outer Rd., Blue Springs, Missouri 64015;

       d)      At these meetings, Rice and Forgey communicated to Cordsen that Hillcrest would fund all expenditures for the Winterberry Project; would fund all expenditures for the Barnhart and Thorpe project so that the

Winterberry Project would have access to roads and utilities; would fund all construction in the Hidden Ridge Project; would make 100%, no cost loans to Winterberry for the Winterberry Project and Hidden Ridge on the Hidden Ridge Project that would cover all development costs for the projects and an interest reserve for all interest payments based on the strong capital position of Hillcrest and the course of dealing and practice between Hillcrest and Cordsen and his entities dating back more than 15 years; was not under increasing scrutiny from banking regulators that would have an impact on Hillcrest's ability to perform agreements with Cordsen and his entities; and affirmed at all times to the Defendants that Hillcrest was capable of performing on the agreements between the parties.

  e)  Both Rice and Forgey made these communications orally during the meeting.

115. These representations were false, as Hillcrest had no intention to fund the Winterberry Project, the Barnhart and Thorpe Project, or the Hidden Ridge Project, but merely induced Cordsen into signing the loans in order to begin its "kill" strategy, as discussed *supra*.

116. The false representations regarding the Winterberry Loan were material because Cordsen, knowing the Winterberry Project was landlocked, needed the roads and utilities from the Barnhart and Thorpe project so he could develop Winterberry. The representations from Rice and Forgey that Hillcrest would fund the Barnhart and Thorpe Project were essential to Cordsen deciding to execute the Winterberry Loan. Moreover, Cordsen knew that he could never pay back the Winterberry loan if he did not finish the infrastructure development in the Winterberry Project because he would not be able to sell any lots.

117. The false representations regarding the Hidden Ridge Loan were material because Hillcrest's commitment to fund all construction in the Hidden Ridge Project was the sole reason Cordsen decided to execute the Hidden Ridge Project.

118. Rice and Forgey had knowledge that these representations were false because they knew Hillcrest wanted to induce Cordsen into signing the loans in order to begin its "kill" strategy, as discussed *supra*.

119.    Rice and Forgey intended Cordsen to act on these representations because they knew the representations would induce Cordsen into executing the Winterberry Loan and the Hidden Ridge Loan.

120.    Cordsen was ignorant of the falsity of these representations as he believed Rice and Forgey when they told him they would fully fund the Winterberry Project, the Hidden Ridge Project, and the Barnhart and Thorpe Project.

121.    Cordsen justifiably relied on Rice and Forgey's false representations when executing the Winterberry Loan and the Hidden Ridge Loan because he would not have executed the loans had Rice and Forgey not made the false representations.

122.    Cordsen had a right to rely on Rice and Forgey's false representations because of the long-standing business relationship between Cordsen, Rice and Forgey that had developed over their years of business dealings as described in detail *supra*.

123.    Rice and Forgey had actual knowledge of, and participated in, the false representations because they knew Hillcrest wanted to induce Cordsen into signing the loans in order to begin its "kill" strategy.

124.    The Defendants were injured as a direct result of Cordsen's reliance on Rice and Forgey's false representations because Cordsen would never have executed the Winterberry Loan or the Hidden Ridge Loan without being induced by Rice and Forgey's statements.

125.    As a direct and proximate result of Codsen's justifiable reliance on the representations of Rice and Forgey, the Defendants suffered a pecuniary loss, the exact amount of which will be proven at trial.

126.    Rice and Forgey's conduct was outrageous because of its evil motive or reckless or callous indifference to the rights of others, specifically the Defendants.   Consequently,

Defendants should receive an award of punitive damages against Rice and Forgey to punish and deter them, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter judgment on Count I of the Counterclaim in favor of the Defendants, and against Donna Rice and Jon Forgey, finding for a sum that is fair and reasonable, plus legal interest on this amount, punitive damages, for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

## COUNT II – FRAUDULENT MISREPRESENTATION
### (Against Rice)

127.    Defendants incorporate paragraphs 1 through 126 above.

128.    Rice made representations to Cordsen, as described with particularity below:

    a)    On various dates in June of 2009;

    b)    Cordsen met with Rice and Forgey;

    c)    At the offices of Hillcrest Bank located on 1100 N.W. South Outer Rd., Blue Springs, Missouri 64015;

    d)    During one of these meetings, Rice communicated to Cordsen that Hillcrest was having trouble with government regulators regarding an "Arizona golf course development" and that Hillcrest needed more collateral on its books; she requested that Cordsen pledge the Additional Collateral to Hillcrest in order to help Hillcrest with the "Arizona golf course debacle"; when Cordsen indicated his unwillingness to pledge his Personal Home and his Lake Home, Rice, in the presence of Forgey, said: "Jack, the bank doesn't want your house;" she further communicated that the Additional Collateral would be released after the "Arizona golf course debacle" was worked out, which would take approximately two months; she also communicated that if Cordsen helped the bank out, the bank would be in a position to help him out in the future;

    e)    Forgey was present when Rice made these oral communications.

129.     These representations were false, as Hillcrest wanted Cordsen to pledge the Additional Collateral in order to be able to foreclose on his properties when Hillcrest began its "kill" strategy as outlined in detail *supra*.

130.     These false misrepresentations were material because they were the sole reason Cordsen pledged the Additional Collateral over to Hillcrest.

131.     Rice had knowledge that these representations were false because she knew Hillcrest wanted Cordsen to pledge the Additional Collateral in order to be able to foreclose on these properties when Hillcrest began its "kill" strategy.

132.     Rice intended Cordsen to act on these representations because she knew her representations would induce Cordsen into pledging the Additional Collateral to Hillcrest.

133.     Cordsen was ignorant of the falsity of these representations as he believed Rice when she said Hillcrest needed the Additional Collateral to help work out the "Arizona golf course debacle."

134.     Cordsen relied on Rice's false representations when pledging the Additional Collateral because he would have never signed over his Personal Home or his Lake Home had he known Hillcrest's true intent was to foreclose on the Additional Collateral as soon as Hillcrest began its "kill" strategy against Cordsen.

135.     Cordsen had a right to rely on Rice's false representations because of the long-standing business relationship between Cordsen, Rice and Forgey that had developed over their years of business dealings as described in detail *supra*.

136.     Rice had actual knowledge of, and participated in, the false representations because she knew Hillcrest wanted Cordsen to pledge the Additional Collateral in order to be able to foreclose on these properties when Hillcrest began its "kill" strategy.

137.     The Defendants were injured as a direct result of Cordsen's reliance on Rice's false representations because Cordsen would never have pledged the Additional Collateral to Hillcrest without being induced by Rice's statements.

138.     As a direct and proximate result of Codsen's justifiable reliance on the representations and concealment of Rice, the Defendants suffered a pecuniary loss, the exact amount of which will be proven at trial.

139.     Rice's conduct was outrageous because of its evil motive or reckless or callous indifference to the rights of others, specifically the Defendants.   Consequently, Defendants should receive an award of punitive damages against Rice to punish and deter her, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter a judgment on Count II of the Counterclaim in favor of the Defendants, and against Donna Rice, finding for a sum that is fair and reasonable, plus legal interest on this amount, punitive damages, for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

**COUNT III – FRAUDULENT NONDISCLOSURE**
**(Against Rice and Forgey)**

140.     Defendants incorporate paragraphs 1 through 139 above.

141.     Forgey was present when Rice made the representations to Cordsen, as described with particularity below:

      a)      On various dates in June of 2009;

      b)      Cordsen met with Rice and Forgey;

> c)     At the offices of Hillcrest Bank located on 1100 N.W. South Outer Rd., Blue Springs, Missouri 64015;
>
> d)     During one these meetings, Rice communicated to Cordsen that Hillcrest was having trouble with government regulators regarding an "Arizona golf course development" and that Hillcrest needed more collateral on its books; she requested that Cordsen pledge the Additional Collateral to Hillcrest in order to help Hillcrest with the "Arizona golf course debacle"; when Cordsen indicated his unwillingness to pledge his Personal Home and his Lake Home, Rice, in the presence of Forgey, said: "Jack, the bank doesn't want your house;" she further communicated that the Additional Collateral would be released after the "Arizona golf course debacle" was worked out, which would take approximately two months; she also communicated that if Cordsen helped the bank out, the bank would be in a position to help him out in the future;
>
> e)     Forgey was present when Rice made these oral communications.

142.   These representations were false, as Hillcrest wanted Cordsen to pledge the Additional Collateral in order to be able to foreclose on his properties when Hillcrest began its "kill" strategy as outlined in detail *supra*.

143.   These false misrepresentations were material because they were the sole reason Cordsen pledged the Additional Collateral over to Hillcrest.

144.   Forgey and Rice had knowledge that these representations were false because they knew Hillcrest wanted Cordsen to pledge the Additional Collateral in order to be able to foreclose on these properties when Hillcrest began its "kill" strategy.

145.   Forgey and Rice intended Cordsen to act on Rice's representations because they knew her representations would induce Cordsen into pledging the Additional Collateral to Hillcrest.

146.   Cordsen was ignorant of the falsity of these representations as he believed Rice when she said Hillcrest needed the Additional Collateral to help work out the "Arizona golf course debacle."

147.     Cordsen relied on Rice's false representations when pledging the Additional Collateral because he would have never signed over his Personal Home or his Lake Home had he known Hillcrest's true intent was to foreclose on the Additional Collateral as soon as Hillcrest began its "kill" strategy against Cordsen.

148.     Cordsen had a right to rely on Rice's false representations because of the long-standing business relationship between Cordsen, Rice and Forgey that had developed over their years of business dealings as described in detail *supra*.

149.     Forgey and Rice had actual knowledge of, and participated in, the false representations because they concealed their knowledge of Hillcrest's true intent: Hillcrest wanted Cordsen to pledge the Additional Collateral in order to be able to foreclose on these properties when Hillcrest began its "kill" strategy.

150.     Forgey and Rice had a demonstrably superior knowledge regarding Hillcrest's decision to sever its business relationship with Cordsen and begin its "kill" strategy; this superior knowledge was not within the fair and reasonable reach of Cordsen.

151.     Cordsen was unable to discover the information regarding Hillcrest's "kill" strategy because Rice and Forgey concealed this information from Cordsen in complete disregard to their long-standing business practices to "trust" each other.

152.     Cordsen exercised reasonable diligence in his relationship with Hillcrest bank by openly communicating with Rice and Forgey and agreeing to their requests to have a business relationship based on mutual "trust."

153.     The Defendants were injured as a direct result of Forgey and Rice's concealment of this material fact because Cordsen would never have pledged the Additional Collateral to

Hillcrest had Forgey or Rice explained to Cordsen the true reasons Hillcrest wanted Cordsen to pledge the Additional Collateral.

154.    As a direct and proximate result of Codsen's justifiable reliance on the representations of Rice and concealment of Forgey and Rice, the Defendants suffered a pecuniary loss, the exact amount of which will be proven at trial.

155.    Forgey and Rice's conduct was outrageous because of its evil motive or reckless or callous indifference to the rights of others, specifically the Defendants.  Consequently, Defendants should receive an award of punitive damages against Forgey and Rice to punish and deter them, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter a judgment on Count III of the Counterclaim in favor of the Defendants, and against Donna Rice and Jon Forgey, finding for a sum that is fair and reasonable, plus legal interest on this amount, punitive damages, for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

## COUNT IV – FRAUDULENT MISREPRESENTATION
### (Against Rice)

156.    Defendants incorporate paragraphs 1 through 155 above.

157.    In April 2010, Cordsen sold his Lake of the Ozarks home (the "**Lake Home**").  It appraised at over $2.5 million, but he had to accept a $1.6 million contract so that he could make the payments that Hillcrest suddenly insisted on despite their prior inducement to Cordsen to provide no cost, 100% financing on the Hidden Ridge Project and the Winterberry Project.

158.    Rice made representations to Cordsen, as described with particularity below:

a)      On various dates in October of 2010;

b)      Cordsen met with Rice and Forgey;

c)      At the offices of Hillcrest Bank located on 1100 N.W. South Outer Rd., Blue Springs, Missouri 64015;

d)      During one of these meetings, Cordsen asked Rice and Forgey to release the deed of trust on the Lake Home so that he could use the proceeds to finish the Winterberry Project; Rice and Forgey, represented to Cordsen that it agreed with the suggested application of the sale proceeds from the Lake Home

e)      Forgey was present when Rice made these oral communications.

159.    Despite Rice's representations concerning the Lake Home, Hillcrest took all of the proceeds from the sale of the Lake Home, and applied the funds in a manner different than Rice's representations to Cordsen.  This left Cordsen completely exposed to Hillcrest on the Winterberry loan.

160.    The representations regarding the application of the sale of the Lake Home were false, as Hillcrest knew it would apply the funds in a manner different than Rice's representations to Cordsen.

161.    These false misrepresentations were material because they were the sole reason Cordsen accepted a $1.6 million contract on the Lake Home.

162.    Rice had knowledge that these representations were false because she knew Hillcrest would apply the funds in a manner different than Rice's representations to Cordsen.

163.    Rice intended Cordsen to act on these representations because she knew her representations would induce Cordsen into accepting a $1.6 million contract on the Lake Home.

164.    Cordsen was ignorant of the falsity of these representations as he believed Rice when she said Hillcrest would use the proceeds to allow Cordsen to finish the Winterberry Project.

165.    Cordsen relied on Rice's false representations when accepting a $1.6 million contract on the Lake Home because he would have never accepted the contract had he known Hillcrest's true intent was to continue its "kill" strategy against Cordsen.

166.    Cordsen had a right to rely on Rice's false representations because of the long-standing business relationship between Cordsen, Rice and Forgey that had developed over their years of business dealings as described in detail *supra*.

167.    Rice had actual knowledge of, and participated in, the false representations because she knew Hillcrest would apply the funds in a manner different than Rice's representations to Cordsen.

168.    The Defendants were injured as a direct result of Cordsen's reliance on Rice's false representations because Cordsen would never have accepted a $1.6 million contract on the Lake Home.

169.    As a direct and proximate result of Codsen's justifiable reliance on the representations and concealment of Rice, the Defendants suffered a pecuniary loss, the exact amount of which will be proven at trial.

170.    Rice's conduct was outrageous because of its evil motive or reckless or callous indifference to the rights of others, specifically the Defendants.  Consequently, Defendants should receive an award of punitive damages against Rice to punish and deter her, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter a judgment on Count IV of the Counterclaim in favor of the Defendants, and against Donna Rice, finding for a sum that is fair and reasonable, plus legal interest on this

amount, punitive damages, for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

## COUNT V – NEGLIGENT MISREPRESENTATIONS
### (Against Rice and Forgey)

171.    Defendants incorporate paragraphs 1 through 170 above.

172.    Rice and Forgey supplied the following information to Cordsen:

    a)    On various dates in July of 2008, Rice and Forgey communicated to Cordsen that Hillcrest would fund all expenditures for the Winterberry Project; would fund all expenditures for the Barnhart and Thorpe project so that the Winterberry Project would have access to roads and utilities; would fund all construction in the Hidden Ridge Project; would make 100%, no cost loans to Winterberry for the Winterberry Project and Hidden Ridge on the Hidden Ridge Project that would cover all development costs for the projects and an interest reserve for all interest payments based on the strong capital position of Hillcrest and the course of dealing and practice between Hillcrest and Cordsen and his entities dating back more than 15 years; was not under increasing scrutiny from banking regulators that would have an impact on Hillcrest's ability to perform agreements with Cordsen and his entities; and affirmed at all times to the Defendants that Hillcrest was capable of performing on the agreements between the parties

    b)    On various dates in June of 2009, Cordsen met with Rice and Forgey; at one of these meetings, Rice communicated to Cordsen that Hillcrest was having trouble with government regulators regarding an "Arizona golf course development" and that Hillcrest needed more collateral on its books; she requested that Cordsen pledge the Additional Collateral to Hillcrest in order to help Hillcrest with the "Arizona golf course debacle"; when Cordsen indicated his unwillingness to pledge his Personal Home and his Lake Home, Rice, in the presence of Forgey, said: "Jack, the bank doesn't want your house;" she further communicated that the Additional Collateral would be released after the "Arizona golf course debacle" was worked out, which would take approximately two months; she also communicated that if Cordsen helped the bank out, the bank would be in a position to help him out in the future.

    c)    On various dates in October of 2010, Cordsen met with Rice and Forgey; at one of these meetings, Cordsen asked Rice and Forgey to release the deed of trust on the Lake Home so that he could use the proceeds to finish the Winterberry Project; Rice and Forgey, represented to Cordsen

that it agreed with the suggested application of the sale proceeds from the Lake Home.

173.    In supplying the information described *supra*, Rice and Forgey failed to exercise reasonable care to ensure the accuracy of said information, and the information supplied to Cordsen was in fact false, namely (1) that Hillcrest would fully fund the Hidden Ridge Project, the Winterberry Project and the Barnhart and Thorpe Project; (2) that Hillcrest had no interest in foreclosing on the Additional Collateral but needed the Additional Collateral on its books to help with an "Arizona golf course debacle"; and (3)  that Hillcrest would allow the proceeds of the Lake Home to go towards the development of the Winterberry Project.

174.    The information described herein was provided intentionally by Rice and Forgey in connection with the Hidden Ridge Loan and the Winterberry Loan.

175.    As a direct and proximate result of the false information supplied by Rice and Forgey concerning: (1) the funding of the Hidden Ridge Project, the Winterberry Project and the Barnhart and Thorpe Project; (2) the Additional Collateral needed for an "Arizona golf course debacle"; (3) and the proceeds of the Lake Home to going towards the development of the Winterberry Project, the Defendants were damaged in that the Defendants were unable to develop the Projects, unable to generate revenue from the Projects, and forced to sell the Lake House.

176.    Furthermore, as a direct and proximate result of Defendants' reliance on the information that Rice and Forgey provided, Defendants have suffered a pecuniary loss, the exact amount of which will be proven at trial.

177.    The conduct of Rice and Forgey was outrageous because of their evil motive or reckless or callous indifference to the rights of others, including the Defendants.  Consequently,

Defendants should receive an award of punitive damages against Rice and Forgey to punish and deter them, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter a judgment on Count V of the Counterclaim in favor of the Defendants, and against Donna Rice and Jon Forgey, finding for a sum that is fair and reasonable, plus legal interest on this amount, punitive damages, for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

## COUNT VI – BREACH OF FIDUCIARY DUTY
### (Against Rice)

178.    Defendants incorporate paragraphs 1 through 177 above.

179.    Throughout the relationship between Cordsen and his entities and Hillcrest, a fiduciary relationship existed between Cordsen and Rice of trust and confidence on the subject of Cordsen's relationship and completion of projects.

180.    Rice were under a duty to act for the benefit of Cordsen and his entities in that Rice was required to take no action that directly benefited Hillcrest and harmed Cordsen or his entities, including, without limitation, those actions set forth above.

181.    Rice at the time she persuaded Defendants to invest in the Winterberry Project and modify the Hidden Ridge Project, and on numerous occasions thereafter, made additional false statements or failed to disclose material information to Defendants, which is set forth in detail above.

182.    Cordsen and his entities placed confidence in Rice, and Rice exercised domination and influence over Cordsen and his entities.

183.    Rice used the confidence that Defendants placed in her in an effort to dominate the Defendants' business.

184.    By these actions and inactions, as set forth *supra*, Rice breached her fiduciary duty to the Defendants.

185.    The breach of these fiduciary duties is the proximate cause of Defendants' damages.

186.    The conduct of Rice was outrageous because of her fraud, evil motive, or reckless or callous indifference to the rights of others, including the Defendants.   Consequently, Defendants should receive an award of punitive damages against Rice to punish and deter them, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter a judgment on Count VI of the Counterclaim in favor of the Defendants, and against Donna Rice, finding for a sum that is fair and reasonable, plus legal interest on this amount, punitive damages, for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

### COUNT VII – NEGLIGENT OR RECKLESS FAILURE TO SUPERVISE
**(Against the Directors)**

187.    Defendants incorporate paragraphs 1 through 186 above.

188.    The Directors had a duty to supervise its employees and officers in the course of their activities on behalf of Hillcrest in connection with Hillcrest's communications and transactions with Cordsen and his entities.

189.    The Directors failed to supervise their employees in this regard by, among other things, failing to review the actions of Rice and Forgey in declaring a default before advancing all of the funds to Winterberry in connection with the Winterberry Project as Hillcrest agreed to do; failure to review the actions of Rice and Forgey in their decision not to release the Additional Collateral and misappropriate and misapply the funds from the sale of the Lake Home; and failure to supervise the reckless actions and communications of Rice and Forgey to Cordsen and his entities, including, without limitation, those actions set forth above.

190.    The failure of the Directors to supervise was negligent or reckless and with malice.

191.    As a direct and proximate result of the failure of the Directors to supervise, Defendants have been damaged.

192.    The conduct of the Directors was outrageous because of their fraud, evil motive, or reckless or callous indifference to the rights of others, including the Defendants. Consequently, Defendants should receive an award of punitive damages against the Directors to punish and deter them, and others, from like conduct in the future.

**WHEREFORE**, defendants Hidden Ridge Development Company, Winterberry Development, LLC, Jack H. Cordsen and the Jack H. Cordsen Trust UTA respectfully request that the Court enter Judgment on Count XVI of the Counterclaim in favor of the Defendants, and against the Directors, jointly and severally, in an amount that is fair and reasonable in excess of $1,000,000; for punitive damages in an amount that is fair and reasonable; for prejudgment and post-judgment interest as provided by law; for Defendants' costs and expenses incurred herein, including, without limitation, attorneys' fees and expenses; and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

ZEILER LAW FIRM, L.C.


By:   /s/ David L. Zeiler
       David L. Zeiler   Mo. #46806
       2012 NW South Outer Rd
       Blue Springs, MO 64015
       816-988-7237
       877-517-2615 [Fax]
       dzeiler@zeilerlawfirm.com
       **ATTORNEYS FOR THE DEFENDANTS**


## CERTIFICATE OF SERVICE

I certify that on July 18, 2011, I served a true and accurate copy of the foregoing on all counsel via ECF notification.

        /s/ David L. Zeiler
       An Attorney for Defendants